## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BLUEFIELD DIVISION

**JOHNNY KEVIN HATFIELD,**

      **Plaintiff,**

**vs.**                                 **CIVIL ACTION NO. 1:19-CV-00893**

**ANDREW SAUL,**
**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's applications for Disability Insurance Benefits (DIB) under Title II and for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Order entered December 16, 2019 (ECF No. 3), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Motion for Summary Judgment (ECF No. 13) and Brief in Support of Judgment on the Pleadings (ECF No. 12) and Defendant's Brief in Support of Defendant's Decision (ECF No. 14).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's motion (ECF No. 13), **GRANT** Defendant's request to affirm the decision of the Commissioner (ECF No.

1

14); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this action from the docket of the Court for the reasons stated *infra*.

**Procedural History**

The Plaintiff, Johnny Kevin Hatfield (hereinafter referred to as "Claimant"), protectively filed his applications for Titles II and XVI benefits on April 23, 2014 and May 14, 2015, respectively, alleging that his disability began on April 14, 2014 because of "broken back, T2 fracture, degenerative disc disease, protruding discs, high cholesterol, asthma, and depression."[1] (Tr. at 590) His claims were initially denied on June 4, 2015 (Tr. at 388-398, 399-409) and again on September 29, 2015 upon reconsideration (Tr. at 412-418, 419-425). Thereafter, Claimant filed a written request for hearing on October 20, 2015. (Tr. at 426-427)

An administrative hearing was held on August 8, 2017 before the Honorable Julianne Hostovich, Administrative Law Judge ("ALJ") (Tr. at 193-224), and on October 12, 2017 the ALJ entered an unfavorable decision (Tr. at 353-380). Following Claimant's Request for Review (Tr. at 483-485), the Appeals Council granted same on June 27, 2018 and remanded the matter back to the ALJ (Tr. at 381-384). Another administrative hearing was held before the ALJ on December 4, 2018 (Tr. at 225-264) and on February 8, 2019 the ALJ entered another unfavorable decision (Tr. at 154-179). Once again, on March 5, 2019, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 543-546) The ALJ's decision became the final decision of the

---

[1] Claimant alleged that he stopped working on September 19, 2012 because he was "laid off." (Tr. at 590) In his Disability Report submitted after the initial level of review, Claimant alleged that his mid and low back pain had worsened, was constant and got worse with movement and activity; he also alleged his depression and nervousness were worse and that he experienced more suicidal ideation, frustration, irritability and does not want to be around people. (Tr. at 617) In a subsequent Disability Report submitted after the reconsideration level of review, Claimant alleged he was having more frequent suicidal and homicidal ideations. (Tr. at 643)

Commissioner on November 21, 2019 when the Appeals Council denied Claimant's Request. (Tr. at 1-7)

On December 13, 2019, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2) The Defendant, (hereinafter referred to as "Commissioner") filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 9, 10) Subsequently, Claimant filed a Motion for Summary Judgment and Brief in Support of Judgment on the Pleadings (ECF No. 13, 12); in response, the Commissioner filed a Brief in Support of Defendant's Decision (ECF No. 14). Consequently, this matter is fully briefed and ready for resolution.

**Claimant's Background**

Claimant was 36 years old as of the alleged onset date and considered a "younger person" throughout the underlying proceedings. See 20 C.F.R. §§ 404.1563(c), 416.963(c). (Tr. at 170) Claimant has a high school education (Tr. at 230) and last worked in 2012 as a mine foreman and section boss for Blue Stone Coal (Tr. at 231), and before that as a coalminer at Rockhouse Coal (Tr. at 233) and prior to that, as a coalminer at Massey Energy (Tr. at 234). All of Claimant's employment had been in underground coalmining. (Id.) On the alleged onset date, Claimant slipped and fell off his house while trying to install a metal roof. (Tr. at 234-235)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant filing for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by

reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(f), 416.920(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. §§ 404.1520(g), 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." 20 C.F.R.

§§ 404.1520a(a), 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment.

Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in Sections 404.1520a(c) and 416.920a(c). Those Sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. See 12.00E of the Listings of Impairments in appendix 1 to this subpart.
>
> (4) When we rate the degree of limitation in the first three functional areas (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself), we will use the following five-point scale: None, mild, moderate, marked, and extreme. The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" will yield a finding that the

impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. §§ 404.1520a(d)(1), 416.920a(d)(1).

Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. §§ 404.1520a(d)(2), 416.920a(d)(2).

Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. §§ 404.1520a(d)(3), 416.920a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. §§ 404.1520a(e)(4), 416.920a(e)(4).

## Summary of ALJ's Decision

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through December 31, 2017. (Tr. at 160, Finding No. 1) Moreover, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the alleged onset date of April 14, 2014. (Id., Finding No. 2) Under the second

6

inquiry, the ALJ found that Claimant had the following severe impairments: a T12 compression fracture, status-post an April 2014 fall; degenerative disc disease of the thoracic spine; degenerative disc disease of the lumbar spine; asthma; obesity; depression; and anxiety. (Id., Finding No. 3)

At the third inquiry, the ALJ concluded Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 161, Finding No. 4) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform light work with the following restrictions:

> [H]e can occasionally climb ramps and stairs. He can never climb ladders, ropes, or scaffolds. He can occasionally balance, stoop, kneel, and crouch. He can never crawl. He can tolerate frequent exposure to extreme cold, wetness, fumes, odors, dusts, gases, and poor ventilation. He needs to use a cane in his right, dominant hand to ambulate. He can understand, remember, and carry out simple, routine tasks involving simple work-related decisions. He can adapt to routine workplace changes. He can occasionally interact with the general public and co-workers.

(Tr. at 163, Finding No. 5)

At step four, the ALJ found Claimant was unable to perform his past relevant work. (Tr. at 169, Finding No. 6) In addition to his age, education, work history, RFC and noting that the transferability of job skills was immaterial, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Claimant could perform. (Tr. at 170, Findings Nos. 7-10) Finally, the ALJ determined Claimant had not been under a disability from April 14, 2014 through the date of the decision. (Tr. at 171, Finding No. 11)

**Claimant's Challenges to the Commissioner's Decision**

Claimant asserts that the ALJ erred on numerous grounds. For starters, the ALJ did not find Claimant's bilateral carpal tunnel syndrome was a severe impairment at step two, despite the fact

that she previously found it to be a severe impairment in the prior decision, and that the evidence

of record corroborated his allegations of functional deficits to the extent that they precluded his

capability of performing the sedentary jobs identified by the vocational expert. (ECF No. 12 at 31-

33) Further, although the ALJ recognized Claimant required a cane to ambulate, she determined

Claimant was capable of light work, which is inconsistent with his cane use pursuant to the

vocational expert's opinion. (Id. at 33-34) Also, Claimant's primary care physicians opined that

he was not physically capable of performing light work. (Id. at 34) With regard to the ALJ's mental

residual functional capacity, she did not properly evaluate Claimant's treating physicians' opinions

under the factors espoused by the Regulations. (Id. at 34-35) The ALJ instead gave more credit to

the non-examining State agency psychological consultants' opinions, even though they did not

review the entire record, which included Claimant's ongoing treatment. (Id. at 35-36) Claimant

asserts that the vocational expert opined that based on the mental limitations found by his treating

psychologist, Claimant would be precluded from substantial gainful activity. (Id. at 36)

Claimant asks this Court to remand this case to correct the errors below. (Id.)

In response, the Commissioner argues that the ALJ's finding Claimant's carpal tunnel

syndrome was a non-severe impairment is supported by substantial evidence, notwithstanding the

vacated prior decision, and she appropriately found his carpal tunnel syndrome did not

significantly limit his ability to engage in basic work activities. (ECF No. 14 at 8-9, 10, n.5)

Further, the ALJ properly evaluated Claimant's treating providers' opinion evidence as it related

to his carpal tunnel syndrome, and provided a good explanation for the values afforded to their

opinions, as they were not only internally inconsistent, but inconsistent with the rest of the record.

(Id. at 9-10) The Commissioner also points out that the ALJ need not adopt a vocational expert's

8

opinion in response to a hypothetical that is not supported by the evidence, but only needs to pose such hypotheticals that fairly sets out Claimant's impairments. (Id. at 10-11) In short, the ALJ's RFC assessment is reasonable as the record did not support the alleged limitations resulting from Claimant's carpal tunnel syndrome precluded sedentary work. (Id. at 11)

The Commissioner next argues that the ALJ's light work RFC determination is also supported by substantial evidence, as it considered those limitations that were credibly supported by the record. (Id. at 11-12) Although the ALJ recognized Claimant's use of a cane to ambulate, this did not eliminate the sedentary jobs identified by the vocational expert, and further, the ALJ considered the evidence of record and determined Claimant's physical impairments did not preclude a range of light work. (Id. at 12-13)

With regard to the opinions provided by Claimant's mental health providers, the ALJ's valuation of same was appropriate because they were inconsistent with the evidence of record. (Id. at 13-14, 15-17) Not only was the ALJ under no duty to accept any opinion that Claimant was disabled, but also, the ALJ is under no legal duty to expressly consider each of the enumerated factors under the Regulations when weighing opinion evidence. (Id. at 14-15) The Commissioner argues that Claimant basically asks this Court to re-weigh the conflicting evidence, which is impermissible, and regardless, the ALJ's mental RFC is supported by substantial evidence. (Id. at 17)

The Commissioner states the final decision is based on substantial evidence and asks this Court to affirm. (Id. at 18)

**The Relevant Evidence of Record**[2]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

Evidence Related to Physical Impairments:

On April 14, 2014, Claimant's alleged onset date and the day of his fall, he underwent an MRI and CT-scan of his thoracic spine, which revealed a "[m]oderate" compression fracture of T12 with "mild" retropulsion of the posterior vertebral body. (Tr. at 721, 724) He was discharged and referred to Panos Ignatiadis, M.D., for a neurosurgical evaluation. (Tr. at 696-727) Later imaging studies taken in May and June 2014 described the "mild" fracture as "stable," with "unremarkable" alignment. (Tr. at 733, 738) On June 17, 2014, Dr. Ignatiadis removed the back brace and referred Claimant to physical therapy. (Tr. at 735-736) Although Claimant complained of persisting pain in his tailbone and buttocks, it was noted that the pain in the "dorsal spine has improved considerably." (Tr. at 755) He had decreased range of motion in the lumbar spine and was prescribed Tramadol for pain control. (Tr. at 756)

On April 22, 2015, Claimant was examined by Stephen Nutter, M.D., at the request of the State Agency. (Tr. at 773-781) Dr. Nutter noted tenderness and limited range of motion in Claimant's dorsolumbar spine, limited straight leg raising bilaterally and movements throughout the examination were painful. (Tr. at 776) Dr. Nutter observed Claimant ambulated with a normal gait, which was not unsteady, lurching or unpredictable, and that Claimant did not require a handheld assistive device; Claimant was capable of performing tandem gait, but had difficulty due

---

[2] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

to back pain and he was able to walk on his toes and squat. (Tr. at 774, 776) An examination of Claimant's hands revealed no tenderness, redness, warmth or swelling; there was no atrophy and he was able to make a fist bilaterally. (Tr. at 775) Dr. Nutter determined Claimant's grip strength was intact and rated 5/5 bilaterally; Claimant was able to write and pick up coins with either hand without difficulty. (Id.) Dr. Nutter reported his diagnostic impression was chronic dorsolumbar strain with prior back correction, shortness of breath, cause undetermined and chest pain; Dr. Nutter noted that although sensory testing was intact, due to the limited straight leg raise test, he could not rule it out. Dr. Nutter reported that the pulmonary examination was normal and Claimant was not short of breath with mild exertion or in the supine position. (Tr. at 776, 777)

On November 23, 2015, Claimant entered physical therapy at Marden Rehabilitation due to low back pain, muscle weakness, difficulty standing, walking, sitting, sleeping and performing activities of daily living. (Tr. at 885-887) On December 3, 2015, Claimant was discharged after five sessions due to increased low back pain, reports of testicular pain and saddle paresthesia; his tolerance of treatment was poor. (Tr. at 894-895)

Imaging in February 2016 of the thoracic spine revealed no other evidence of acute bony abnormalities, disc herniation, cord compression, significant canal stenosis, or significant foraminal stenosis. (Tr. at 926-927) Likewise, images of his lumbar spine also only revealed a "small" central disc protrusion at the L3-L4 level and "mild" degenerative disc signal. (Tr. at 719) Subsequent lumbar imaging revealed only "minimal" lower arthropathy without any other acute findings, with an "otherwise normal" lumbosacral spine. (Tr. at 814; see also Tr. at 883, 928 (no evidence of disc herniation, spinal stenosis, or foraminal stenosis)). Imaging of Claimant's left wrist was also normal. (Tr. at 722)

<u>Evidence Related to Mental Impairments:</u>

On July 23, 2014, Claimant underwent psychological testing at Lantern Mental Health with David B. Lawson, M.A. (Tr. at 1020-1029) Testing revealed diagnostic impressions for: bipolar disorder, social anxiety disorder, generalized anxiety disorder and post-traumatic stress disorder. (Tr. at 1029) Since July 2014, Claimant had monthly individual therapy sessions with Mr. Lawson. (Tr. at 1019-1048, 1053, 1085-1089, 1106-1111, 1178-1194, 1231-1237, 1326) On September 15, 2015, Mr. Lawson completed a "Routine Abstract Form – Mental" and affirmed the diagnoses from the July 2014 testing, and noted Claimant was fully oriented, with normal speech, restricted affect, paranoid, preoccupied thought processes, and normal perceptions; mildly deficient insight and judgment; retarded psychomotor because of his cane and back brace; normal immediate memory, moderately deficient recent memory, and mildly deficient remote memory; mildly deficient social functioning; severely deficient concentration; mildly deficient persistence; moderately deficient pace. (Tr. at 845) Mr. Lawson opined that Claimant was not capable of managing his benefits if awarded. (<u>Id</u>.)

On August 20, 2014, Claimant began psychiatric treatment at Beckley Psychiatric Services under the care of Hassan Jafary, M.D.; Dr. Jafary diagnosed Claimant with major depressive disorder, insomnia, mood disorder due to mental illness; he noted his prognosis as good with medication compliance. (Tr. at 940) He prescribed Trazodone, Neurontin, Wellbutrin, Cymbalta and Ambien. (<u>Id</u>.) In a letter dated October 21, 2014, Dr. Jafary reported:

> Due to the severity of his diagnosis, [Claimant]'s daily life and activities has been impaired in all areas. He has periods where his thought processes are disorganized which affect his decision making skills and social functioning.

[Claimant] has been very cooperative and participating in the treatment plan, however, in the meantime, it is in the best interest of [Claimant] that he remain unemployed as we work together to increase his overall functioning.

(Tr. at 941)

After his initial consultation, Claimant began monthly examinations with Dr. Jafary. (Tr. at 938-960, 1049-1052, 1062-1064, 1112, 1126-1141, 1217-1228, 1341-1344) Treatment notes consistently describe Claimant as psychiatrically stable with compliance with medication. (Tr. at 1220, 1341-1342, 1344) Claimant's mental status examinations did not regularly note any significant, abnormal findings, and rather, his treating providers described him as oriented x3, with normal speech, logical and goal-directed thought processes, good insight and judgment, intact memory, and good/fair attention and concentration. (Tr. at 959, 1049-1050, 1063-1064, 1126, 1128, 1130, 1341-1342) Similarly, Claimant generally presented to medical examinations with a normal, appropriate, or euthymic mood and affect (Tr. at 942-945, 947, 949, 976, 992, 998 (not depressed), 1050, 1052, 1062, 1067, 1071, 1083, 1097, 1101, 1116, 1120 (not depressed), 1134, 1136, 1138, 1153, 1158, 1253).

On April 6, 2015, Claimant was evaluated by Sunny Bell, M.A., at the request of the State Agency. (Tr. at 764-768) Ms. Bell's diagnostic impression was unspecified depressive disorder, social anxiety disorder, and generalized anxiety disorder. (Tr. at 767) She reported Claimant's recent memory skills were moderately deficient, remote memory skills were mildly deficient, concentration was mildly deficient, pace and persistence within normal limits, and his prognosis was poor. (Tr. at 767, 768)

Claimant was briefly hospitalized at Beckley Appalachian Regional Healthcare in July 2016 for depressive symptoms, and suicidal and homicidal ideations after discovering his wife was

cheating on him. (Tr. at 1054-1055)

Primary Care Provider Records:

Claimant began primary care with Charles Porterfield, D.O., and Peggy Huffman, APRN, on May 29, 2014 for back pain, shortness of breath, asthma, wheezing and cough. (Tr. at 966) An examination revealed Claimant had decreased range of motion, radicular pain, but no joint swelling or pain; Claimant was wearing his back brace. (Tr. at 967) It was noted during subsequent visits that Claimant used a cane and that he was recommended to continue using it, and to exercise by walking 3-4 times per week. (Tr. at 968, 971, 972, 976, 980, 986, 1005, 1009)

Claimant began treatment with Saad Zafar, D.O., on August 16, 2016 for his back pain and other ailments. (Tr. at 1069-1072) Examination notes from monthly examinations with Dr. Zafar did not reveal any abnormal musculoskeletal findings, except for noting an irregular gait with the use of a cane and some diminished sensation (Tr. at 1071, 1075, 1079, 1083, 1092, 1097, 1101, 1154, 1163, 1169, 1309, 1315, 1337 (all normal motor strength and tone; normal movement of all extremities; no edema); but see also Tr. at 1067 (normal gait)). Claimant also consistently had full (5/5) strength in both the upper and lower extremities. (Tr. at 731, 736, 751, 872)

Opinion Evidence:

On February 8, 2016, Dr. Porterfield completed a "Medical Source Statement of Ability to do Work-Related Activities (Physical)" form. (Tr. at 930-935) Dr. Porterfield opined that Claimant could never lift and carry up to 10 pounds (Tr. at 930); that he could sit 15-20 minutes at one time without interruption and total in an 8-hour workday; stand 20-25 minutes without interruption and total in an 8-hour workday; and walk 10 minutes without interruption and total in an 8-hour workday (Tr. at 931). Dr. Porterfield opined that Claimant's cane use was medically necessary and

14

that he could ambulate 50 feet without the use of his cane but he could carry small objects with his free hand; Dr. Porterfield based this assessment on the "MRI reports." (Id.) Dr. Porterfield opined Claimant was limited to reaching overhead and in all directions, and handling, fingering, and feeling, occasionally, but could never push or pull bilaterally. (Tr. at 932) Claimant was limited to occasionally climbing stairs and ramps, and occasionally balance, kneel and crouch, but could never climb ladders or scaffolds, and never stoop or crawl, based on the "MRI" (Tr. at 933). Claimant could not tolerate exposure to unprotected heights, moving mechanic parts, extreme heat or cold or vibrations, but could occasionally operate a motor vehicle and be exposed to humidity, and can frequently be exposed to dust, odors, fumes and pulmonary irritants. (Tr. at 934) Dr. Porterfield opined Claimant could not shop, travel without a companion, or walk a block at a reasonable pace on rough or uneven surfaces. (Tr. at 935) However, Dr. Porterfield opined Claimant was capable of ambulating without using a wheelchair, walker, or 2 canes or 2 crutches, using standard public transportation, climbing a few steps at a reasonable pace with the use of a single handrail, preparing simple meals and feeding himself, care for his personal hygiene and sort, handle or use paper/files. (Id.) Dr. Porterfield stated Claimant's inability to work was due to his back pain and that Claimant wore a back brace continuously. (Id.)

On June 21, 2017, Dr. Zafar completed a "Medical Source Statement of Ability to do Work-Related Activities (Physical)" form. (Tr. at 1144-1149) Dr. Zafar opined that Claimant could never lift and carry up to 10 pounds because of his back brace and back fracture (Tr. at 1144); that he could sit, stand, and walk up to 30 minutes without interruption, and sit or walk up to 2 hours total and stand up to 4 hours total in an 8-hour workday, and he would need to change position (Tr. at 1145); that Claimant's cane use was medically necessary and that he could ambulate 20 feet

without the use of his cane and that he could not carry small objects with his free hand (Id.); that Claimant was limited to reaching overhead and in all directions, and handling, fingering, feeling, and pushing and pulling bilaterally occasionally due to his back pain (Tr. at 1146); and that Claimant was limited to occasionally climbing stairs and ramps and balancing, but could never climb ladders, scaffolds, and never stoop, kneel, crouch, or crawl (Tr. at 1147). He could not tolerate exposure to unprotected heights, moving mechanic parts, heat, cold or vibration, but could occasionally operate a motor vehicle, and be exposed to humidity, dust and pulmonary irritants. (Tr. at 1148) Dr. Zafar opined Claimant could not shop, travel without a companion, walk a block at a reasonable pace on rough or uneven surfaces, or use standard public transportation. (Tr. at 1149) However, Dr. Zafar opined Claimant was capable of ambulating without using a wheelchair, walker, or 2 canes or 2 crutches, climbing a few steps at a reasonable pace with the use of a single handrail, preparing simple meals and feeding himself, care for his personal hygiene and sort, handle or use paper/files. (Id.)

On September 11, 2018, Ms. Huffman completed a "Medical Source Statement of Ability to do Work-Related Activities (Physical)" form. (Tr. at 1199-1204) She opined Claimant could never lift or carry up to 10 pounds; could sit for 2 hours without interruption, stand for 1 hour without interruption and walk for less than 1 hour without interruption, but sit, stand, and walk for "0" minutes total in an 8-hour workday. (Tr. at 1199-1200) She opined Claimant's cane use was medically necessary, and that he could walk up to 50 feet without resting, but unable to use his free hand to carry small objects. (Tr. at 1200) She indicated Claimant could occasionally climb stairs and ramps, balance, and stoop, but could never climb ladders or scaffolds, kneel, crouch, or crawl. (Tr. at 1202) Claimant could never be exposed to unprotected heights, moving mechanical

16

parts, humidity or wetness, or vibrations; Claimant could tolerate occasional exposure to operating a motor vehicle, pulmonary irritants, and extreme cold and heat. (Tr. at 1203) Ms. Huffman opined Claimant could not travel without a companion, walk a block at a reasonable pace on rough or uneven surfaces, or climb a few steps at a reasonable pace with the use of a single handrail. (Tr. at 1204) However, Ms. Huffman opined Claimant was capable of shopping, ambulating without using a wheelchair, walker, or 2 canes or 2 crutches, using standard public transportation, preparing simple meals and feeding himself, caring for his personal hygiene and was able to sort, handle or use paper/files. (Id.)

On September 14, 2018, Mr. Lawson completed a Mental Impairment Questionnaire. (Tr. at 1238-1243)[3] Mr. Lawson identified Claimant's diagnoses including bipolar disorder, social anxiety disorder, posttraumatic stress disorder, and borderline intellectual functioning based on testing results and individual therapy. (Tr. at 1238-1239) Mr. Lawson opined Claimant's mental conditions result in marked limitations in several areas of work-related activities as well as marked limitation in his activities of daily living, social functioning and in maintaining concentration, persistence or pace. (Tr. at 1241) Mr. Lawson opined Claimant would be unable to complete an eight-hour workday or be absent 4 or more days per month (Tr. at 1242) and he would be capable of managing benefits in his own best interests (Tr. at 1243).

On November 28, 2018, Dr. Zafar completed another "Medical Source Statement of Ability to do Work-Related Activities (Physical)" form. (Tr. at 1348-1353) Dr. Zafar opined that Claimant

---

[3] The record shows that Mr. Lawson completed a prior Questionnaire on May 20, 2016 (Tr. at 1013-1018) that contains similar findings, although at that time, Mr. Lawson found Claimant had moderate difficulties in his ability to maintain concentration, persistence or pace and one or two episodes of decompensation within a 12 month period, each of at least two weeks duration (Tr. at 1016).

could occasionally lift and carry 10 pounds; sit no more than 25 minutes at a time; stand no more than 20 minutes at a time; and walk no more than 30 minutes at a time. (Tr. at 1348-1349) In an 8-hour workday, Claimant could sit no more than 3 hours and stand/walk no more than 2-3 hours total. (Tr. at 1349) Dr. Zafar determined that Claimant's cane use was medically necessary and that Claimant could ambulate no more than 70 feet without it. (Id.) He opined that Claimant could use either hand in reaching, handling, fingering, feeling, pushing or pulling occasionally. (Tr. at 1350) Claimant could perform postural activities only occasionally, but never climb ladders or scaffolds. (Tr. at 1351) He could not tolerate exposure to unprotected heights, moving mechanic parts, humidity, dust and pulmonary irritants, heat, cold or vibration, but could occasionally operate a motor vehicle. (Tr. at 1352) Dr. Zafar opined Claimant could not shop, travel without a companion, ambulate without using a wheelchair, walker, or 2 canes or 2 crutches, walk a block at a reasonable pace on rough or uneven surfaces, or climb a few steps at a reasonable pace with the use of a single hand rail. (Tr. at 1353) However, Dr. Zafar opined Claimant was capable of using standard public transportation, preparing simple meals and feeding himself, and could care for his personal hygiene as well as sort, handle or use paper/files. (Id.)

**The Administrative Hearings**

August 8, 2017 Claimant Testimony:

Claimant testified that after he fell off his roof in April 2014, he received physical therapy and pain management for treatment. (Tr. at 200) Additional surgery was recommended for his back. (Tr. at 201) For pain relief, he takes his medicine and stays off his feet as much as he can. (Id.) For his lower back pain, he uses a TENS unit twice a day and a heating pad morning and evening for some relief. (Tr. at 207-208) His pain causes him difficulty with sleeping. (Tr. at 208)

He was right-handed and used it to hold his cane. (Tr. at 202) He estimated that he could stand for about 15 to 25 minutes before he had to sit, sit for 15 to 20 minutes before he had to change position, and walk between 150 to 225 [feet]. (Id.)

Claimant testified that the heat affects his breathing, as well as smoke, dust and candle scents. (Tr. at 209)

Claimant testified that his depression makes him uncomfortable around people and does not want to go out and do things. (Tr. at 210-211) He also thinks about suicide a lot. (Tr. at 211) Claimant stated his memory and concentration have also been affected, and that he doesn't have patience to do things. (Tr. at 211-212) His anxiety also makes him not want to be in crowds. (Tr. at 212) He has nightmares of falling from his roof. (Id.) Claimant also stated that he has trouble controlling his emotions and suffers from chronic headaches. (Tr. at 213)

Claimant testified that his hands go to sleep often from holding his cane or when he's driving from holding the steering wheel. (Tr. at 215) He explained he has bilateral numbness from his ring fingers across to his thumbs; he estimated he starts having numbness after five minutes. (Id.) He has lost his grip on things, although his fingers "work okay." (Tr. at 215-216) Surgery had been recommended for his carpal tunnel. (Tr. at 216)

Claimant stated he lived alone in a camper, seldom drove except to the gas station and to doctor's appointments, and his mother does his shopping and washes his clothes. (Tr. at 203) He can take care of his personal care. (Tr. at 203-204) On a typical day he walks around a little bit outside, watches TV, and visits with his mother. (Tr. at 204) He testified that his medications cause drowsiness, sleepiness and lethargy. (Tr. at 206) He manages his own finances. (Id.)

19

<u>December 4, 2018 Claimant Testimony:</u>

Claimant testified that he has constant pain in his mid and lower back and that at times it radiates to his hips and legs. (Tr. at 235) He said the only way the pain eases up is to "crawl up in a ball." (Tr. at 236) He did not have surgery for these conditions, his insurance would not pay for it. (<u>Id</u>.) Claimant testified that physical therapy made his pain worse. (Tr. at 237) He wears a back brace on a daily basis. (Tr. at 238) Dr. Zafar prescribed him a cane and it provides Claimant with more stability. (<u>Id</u>.) Although he takes medication for his back pain, it doesn't help much and that his pain is getting worse. (Tr. at 239) He said activity makes his pain worse. (<u>Id</u>.) He also uses a TENS unit about three times a week and it eases his pain a little bit. (Tr. at 240-241) Taking hot showers and lying down also helps with pain relief. (Tr. at 241) He continues to have poor and broken up sleep due to pain and he is tired during the day. (Tr. at 241-242)

Claimant confirmed that he still had trouble with numbness and grip strength in both hands and that he has more numbness the more he uses his hands. (Tr. at 244-245) He also has trouble buttoning buttons, picking up coins, or peeling an apple. (Tr. at 245) His hand problems frustrate him; he will have to stop and rest from doing household chores like cleaning or cooking because of his hands. (Tr. at 245-246) Claimant testified that he was not receiving any treatment or splints for his carpal tunnel syndrome, and although he was recommended to take a test, he never did follow up on it; he received his carpal tunnel diagnosis through a physical examination. (Tr. at 255)

Claimant confirmed that he still suffers from depressive symptoms and continues to receive treatment with counseling and medication. (Tr. at 249-250) He stated that counseling has been

helpful, but the medication doesn't help as much. (Tr. at 250-251) He was hospitalized for suicide and still has suicidal thoughts. (Tr. at 251-252)

Claimant testified that bending, stooping, crouching and squatting are difficult for him and he would have trouble getting up from those positions. (Tr. at 242-243) He does have some difficulty putting his socks on, but not with bathing. (Tr. at 243)

Claimant testified that he could stand for about 15 to 40 minutes before he had to sit down; walk for about 20 to 35 minutes before he had to sit; and sit for about 35 to 40 minutes at a time. (Tr. at 240) Claimant estimated he can lift and carry about five to eight pounds. (Tr. at 243)

He spends a typical day getting out in the yard and walking around a little, trying to keep moving as much as he can. (Tr. at 252) He needs some assistance with some of the household chores such as cleaning, and he doesn't cook, but will fix simple meals, and he does no yard work. (Tr. at 252-253) He watches TV, but can no longer hunt, fish or go camping. (Tr. at 253) Because his medication makes him drowsy, he will take naps during the day. (Tr. at 254-255)

Vocational Expert ("VE") Testimony:

The ALJ asked the VE to assume an individual with Claimant's age, education and work experience who could perform light work with occasionally climbing ramps and stairs; never climbing ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, and crouch; never crawl; tolerate frequent exposure to extreme cold, wetness, fumes, odors, dust, gases, and poor ventilation; would need to use a cane to ambulate and the cane would be used in the right dominate hand; can understand, remember, and carry out simple, routine tasks involving only simple, work-related decisions with the ability to adapt to routine workplace changes; can have occasional interaction with the general public and coworkers. (Tr. at 257)

The VE responded that someone with Claimant's vocational profile and RFC could perform work at the sedentary level such as a hand assembler, grader/sorter, and table worker. (Tr. at 257-258, 260) The VE testified further that if the individual were limited to being capable of only frequently handling, fingering, and feeling bilaterally, these sedentary jobs would be eliminated, as they require constant use of the hands. (Tr. at 260) The VE testified that if the individual would be expected to miss two or more days of work per month, be off task more than 15 percent of the workday, or unable to maintain attention for two-hour segments of time during the workday, there would be no jobs. (Tr. at 261-262) Further, the VE stated there would be no jobs if the individual was unable to maintain regular attendance or be punctual within customary allowances, unable to perform at a constant pace without an unreasonable number and length of rest periods, or unable to accept instructions and respond appropriately to criticism from supervisors. (Tr. at 262-263)

## **Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner

is based upon an appropriate application of the law. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." <u>Blalock</u>, 483 F.2d at 775.

**<u>Analysis</u>**

<u>Determining Severe Impairment:</u>

Claimant has alleged the ALJ erred because she did not find his carpal tunnel syndrome was a severe impairment, although his primary care providers opined he was limited to only occasional handling, fingering and feeling and that he has stated in his applications for disability and testified that he has numbness and limited fine and gross manipulations in both hands. (ECF No. 12 at 32-33) A "severe" impairment is one "which significantly limits your physical or mental ability to do basic work activities." <u>See</u> 20 C.F.R. §§ 404.1520(c), 416.920(c). "Basic work activities" refers to "the abilities and aptitudes necessary to do most jobs." <u>Id</u>. §§ 404.1522(b), 416.922(b). The Regulations provide examples of these activities:

> (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) capacities for seeing, hearing, and speaking;
> (3) understanding, carrying out, and remembering simple instructions;
> (4) use of judgment;
> (5) responding appropriately to supervision, co-workers and usual work situations; and
> (6) dealing with changes in a routine work setting.

<u>Id</u>. Contrariwise, an impairment may be considered " 'not severe' only if it is a slight abnormality

which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984).

Additionally, Claimant had to prove that he had an impairment (or combination of impairments) that had more than a minimal effect on his ability to do basic work activities for a continuous period of no less than 12 months. 20 C.F.R. §§ 404.1505(a), 416.905(a); SSR 96-3, 1996 WL 374181. The impairment must also not "be reasonably controlled by medication or treatment[.]" See Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986). Claimant also bears the burden of establishing a disabling impairment. See Heckler v. Campbell, 461 U.S. 458, 460 (1983); Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987) (holding that the claimant bears the burden of proof and persuasion at steps one through four, stating "it is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so").

At step two, the ALJ acknowledged Claimant had been diagnosed with bilateral carpal tunnel syndrome. (Tr. at 160, 1070)[4] The ALJ then determined that there was no evidence that this impairment more than minimally limits Claimant's ability to engage in basic work activities, noting his testimony that he "is not currently receiving any treatment", he does not wear a wrist splint, and there was no evidence his physicians recommended surgery. (Tr. at 160) The ALJ further noted that there was no evidence of atrophy, weakness, or deficits throughout either upper

---

[4] The ALJ referenced a treatment note dated August 16, 2016 from Dr. Zafar, which indicated a carpal tunnel syndrome diagnosis with an "onset" date of August 16, 2016.

extremity, no positive Tinel's or Phalen's sign[5] in either upper extremity, thus, the ALJ determined Claimant's bilateral carpal tunnel syndrome was a "non-severe impairment." (Id.) Indeed, the ALJ found other severe physical impairments, and it is well known that there is no reversible error when an adjudicator fails to list all a claimant's severe impairments at step two so long as at least one severe impairment is found and that the adjudicator considers all severe impairments and limitations therefrom in the next steps in the sequential evaluation process. See Lauver v. Astrue, No. 2:08-cv-87, 2010 WL 1404767, at *4 (N.D.W.Va. Mar. 31, 2010). Further, this Circuit and District has recognized " 'there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision[.]' " Reid v. Commissioner of Social Sec., 769 F.3d 861, 865 (4th Cir. 2014) (quoting Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2006) (per curiam)); see also Goad v. Astrue, No. 06-00870, 2008 WL 644881, at *1 (S.D.W.Va. Mar. 7, 2008); Nisbet v. Colvin, No. 13-33047, 2015 WL 893010, at *17 (S.D.W.Va. Mar. 2, 2015); Bays v. Colvin, No. 14-1564, 2005 WL 769784, at *21 (S.D.W.Va. Feb. 23, 2015). Moreover, it is known that " 'an ALJ's failure to cite specific evidence does not indicate that it was not considered' " See Monroe v. Colvin, 826 F.3d 176 (4th Cir. 2016), " 'an ALJ's failure to cite specific evidence does not indicate that it was not considered.' " (quoting Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000)).

Although the ALJ may not have specifically mentioned Dr. Nutter's report, she explicitly stated that she considered all the evidence of record when assessing Claimant's RFC. (See Tr. at 163 ("After careful consideration of the entire record")); (see also Tr. at 169 ("After a careful

---

[5] There are no references to Tinel's or Phalen's testing in the record; from the undersigned's review of the record, the only observations of record concerning Claimant's hands by a medical expert are from Dr. Nutter's examination report, discussed supra.

consideration of all the evidence. . .")) Having so stated, this Court should "take her at her word." See Reid, 769 at 865 ("The Commissioner, through the ALJ and Appeals Council, stated that the whole record was considered, and, absent evidence to the contrary, we take her at her word."); see also Hackett v. Barnhart, 395 F.3d 1168, 1173 (10th Cir. 2005) ("[O]ur general practice, which we see no reason to depart from here, is to take a lower tribunal at its word when it declares that it has considered a matter."); Christina W. v. Saul, Case No. 4:19-cv- 00028-PK, 2019 WL 6344269, *4 (D. Utah Nov. 27, 2019).

Clearly, the ALJ's consideration of the evidence as it related to Claimant's alleged carpal tunnel syndrome impairments went well beyond the second step in the sequential evaluation process, therefore, the undersigned **FINDS** the ALJ's omission to include Claimant's bilateral carpal tunnel syndrome as a severe impairment at step two is without error.

To the extent that Claimant has argued that the ALJ previously found carpal tunnel syndrome to be a "severe" impairment and limited him to "frequent" handling, fingering, and feeling in the prior October 2014 decision (ECF No. 12 at 31), this argument lacks merit. As noted by the Commissioner, "once a prior ALJ decision is vacated and additional evidence is taken, an ALJ does not 'run afoul' of the doctrine by issuing a de novo RFC finding. See Tanner v. Comm'r of Soc. Sec., 602 F. App'x 95, 98 (4th Cir. 2015)." (ECF No. 14 at 10, n.5) In this case, the prior ALJ decision was vacated, a new hearing was held, and additional evidence, including a new hearing with additional VE testimony, was entered into the record, thus any prior findings by the ALJ enjoy no special significance.

Moreover, although Claimant contends that the medical records show he has a diagnosis for carpal tunnel syndrome (ECF No. 12 at 33), the mere diagnosis of an impairment is not enough

to prove disability. <u>Thompson v. Astrue</u>, 442 F. App'x 804, 808 (4th Cir. 2011). Claimant must demonstrate "a showing of related functional loss", however, Claimant has not done so here. <u>Gross</u>, 785 at 1166. Despite the medical source statements from his primary care providers, Drs. Zafar and Porterfield, both of whom opined Claimant is limited to only "occasional" handling, fingering and feeling, the ALJ specifically examined their opinions, noting that they each determined Claimant experienced "manipulative" limitations. (Tr. at 167-168, 932-934, 1202-1204[6], 1146-1148, 1350-1352). After expressly considering and discussing these opinions, the ALJ gave them "little weight", observing their inconsistency with the evidence of record. (Tr. at 167-168) With regard to Dr. Porterfield's[7] opinion, the ALJ also noted their own treatment records as well as imaging studies did not support the limitations they endorsed. (Tr. at 167) Further, the ALJ noted that Dr. Porterfield's recent examination notes indicated that Claimant presented without any evidence of muscle weakness, joint pain, back pain, swelling, decreased range of motion, or decreased range of motion (Tr. at 167, 1209-1210).[8] The ALJ noted that Dr. Zafar's own examination notes actually showed normal and full motor strength and tone throughout Claimant's musculoskeletal system, and further noted that imaging studies did not support such

---

[6] Although the ALJ indicated Ms. Huffman also opined Claimant had "manipulative", among other restrictions, she actually provided no opinion to this extent, having written "not tested" on her form under the "Use of Hands" heading. (Tr. at 1201)

[7] Dr. Porterfield indicated on his form that Claimant's handling, fingering and feeling should be limited, "due to pain in back" (Tr. at 1146).

[8] It is interesting that the record shows that Claimant only ever presented to Dr. Porterfield with complaints of asthma and back pain; he never complained about his hands or wrists (Tr. at 968, 1065, 1114, 1206, 1209, 1212; <u>see also</u> Tr. at 964 (grip strength not tested), Tr. at 1201 (use of hands not tested)).

limitations (Tr. at 168, 1071, 1075, 1079, 1083, 1092, 1097, 1101, 1154, 1163, 1169, 1309, 1315, 1337).[9]

Finally, to the extent Claimant has argued that the vocational expert's testimony shows that he is effectively disabled on account of his manipulative restrictions (ECF No. 12 at 33), it has long been established that an ALJ's hypothetical question to the vocational expert "need only reflect those impairments supported by the record." Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989) (a vocational expert's opinion "must be in response to proper hypothetical questions which fairly set out all of claimant's impairments" (emphasis added)); Yaun v. Colvin, No. 7:14-CV-00012-RN, 2015 WL 1186352, at *3 (E.D.N.C. Mar. 16, 2015) ("As the hypothetical questions referenced by Plaintiff did not adequately reflect the impairments found by the ALJ, the responses to those questions are not substantial evidence of her ability, or lack thereof, to engage in other work."). Although the vocational expert testified that the jobs identified would no longer remain if an individual were limited to "frequent" handling, fingering, and feeling, the ALJ reasonably found that the record failed to support such limitations.

From the undersigned's review of the ALJ's discussion of the evidence as it related to Claimant's carpal tunnel syndrome, it is clear that the ALJ considered all the evidence, and ultimately determined this impairment did not have a significant impact on his overall functioning precluding all work-related activities. Accordingly, the undersigned **FINDS** the ALJ's assessment of Claimant's this impairment is supported by substantial evidence.

The RFC Assessment:

---

[9] It is also significant that Dr. Zafar's form did not identify any "particular medical or clinical findings" to support his assessment that Claimant be limited to only occasional handling, fingering and feeling with both hands. (Tr. at 1350)

Claimant argued that the ALJ erroneously found he is capable of light work in spite of her finding he needed a cane to ambulate, which precludes light work per the vocational expert's testimony. (ECF No. 12 at 33-34) Claimant asserts both his primary care providers found he was incapable of light work, given the lifting, carrying, walking and standing restrictions. (Id. at 34)

The RFC assessment represents the *most* that an individual can do despite his imitations or restrictions. See SSR 96-8p, 1996 WL 3744184, at *1 (emphasis in original). The Regulations provide that an ALJ must consider all relevant evidence as well as consider a claimant's ability to meet the physical, mental, sensory and other demands of any job; this assessment is used for the basis for determining the particular types of work a claimant may be able to do despite his impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a). The RFC determination is an issue reserved to the Commissioner. See Id. §§ 404.1527(d), 416.927(d).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physician's opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

With respect to his physical impairments as they related to his ability to lift, carry, walk and stand, the ALJ noted that Claimant reported "a stinging, stabbing mid-to-lower back pain that radiates throughout both lower extremities []." (Tr. at 164) The ALJ further noted that Claimant "indicates that the pain affects his ability to stand, walk, or sit for an extended period of time, specifying that he is unable to do exertional activity for more than forty minutes before needing to stop and rest[]. He testified he lies down throughout a typical day. He reports the use of a back brace and cane[]." (Id.) The ALJ then compared Claimant's statements and testimony concerning

29

his alleged disabling conditions with the objective and other evidence of record, and ultimately determined that the evidence simply did not support Claimant's allegations that he was so limited that all substantial gainful activity was precluded. (Tr. at 164-166)

Because only the ALJ is tasked with determining the particular facts in a case and to resolve the inconsistencies therein, this Court does not re-weigh conflicting evidence or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).[10] Indeed, the ALJ explicitly considered the assessments provided by the State agency medical consultants, both of whom determined that Claimant could perform work at the light exertional level with additional environmental limitations. (Tr. at 167, 288-290, 326-328) The ALJ gave the opinions "partial weight", finding them "consistent with the clinical record at the time they were formed", and acknowledged that the most recent examination notes indicated Claimant had slightly greater exertional limitations. (Tr. at 167)

Despite Claimant's argument that the ALJ erred by adopting a light RFC that is inconsistent with the use of a cane in his right hand to ambulate (ECF No. 12 at 33), Claimant neglects to appreciate that the ALJ posed a hypothetical question to the vocational expert that included his cane use, resulting in a finding that there were other sedentary jobs Claimant could perform. (Tr. at 257-258, 260) The ALJ explicitly noted that the vocational expert testified that an individual with Claimant's vocational background, age, and education and limited to light work with the

---

[10] As noted *supra*, with regard to Claimant's physical impairments, the ALJ discussed the opinion evidence provided by Claimant's primary treatment providers, specifically noting how they were both inconsistent with their own treatment records, with the other medical evidence of record, including Claimant's own testimony: "For example, while Dr. Porterfield opined that the claimant is unable to shop, he testified that he continues to shop for groceries[]." (Tr. at 167; "While Dr. Zafar opines that the claimant is unable to lift and/or carry more [than] ten pounds, he described normal strength and tone throughout his musculoskeletal system[]." (Tr. at 168); "While Dr. Zafar opined that the claimant is unable to shop, he testified that he shops for groceries[]." (Id.)

aforementioned postural and environmental restrictions could still perform other sedentary jobs in the national economy. (Tr. at 170-171) In short, Claimant has not overcome his burden in showing how the ALJ's erroneous RFC assessment would have made a difference in the outcome of his disability claim. See Shinseki v. Sanders, 556 U.S. 396, 409, 129 S.Ct. 1696, 1705, 173 L.Ed.2d 532 (2009). In this case, the vocational expert, as well as the ALJ herself, identified the conflict between the light RFC assessment with Claimant's cane use, nevertheless, even under those parameters, the vocational expert identified jobs that Claimant could still do. Pearson v. Colvin, 810 F.3d 204 (4th Cir. 2015); (see also, Tr. at 257-260) Accordingly, the ALJ was entitled to rely on the vocational expert's testimony that a person with Claimant's RFC could perform a number of unskilled, sedentary jobs existing in the national economy.

Because the ALJ is only required to incorporate those limitations established by the record, particularly with respect to any manipulative restrictions, discussed *supra*, the undersigned **FINDS** the ALJ's RFC assessment is supported by substantial evidence.

Evaluation of Opinion Evidence:

As noted *supra*, Claimant contends the ALJ did not provide a thorough analysis when evaluating the opinion evidence provided by his mental health providers, Mr. Lawson and Dr. Jafary insofar as she did not address the enumerated factors endorsed by the Regulations. (ECF No. 12 at 34-35)

Per 20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1):

Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

Under §§ 404.1527(c)(1) and 416.927(c)(1), more weight is given to an opinion provided by a physician who examines a claimant than to a non-examining physician. With respect to the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See Id. §§ 404.1527(c)(2), 416.927(c)(2).[11] Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(c)(2), 416.927(c)(2). Ultimately, it is the responsibility of the Commissioner, not the court, to review the case, make findings of fact, and to resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not

---

[11] The treating source rule has since been eliminated, effective March 27, 2017, however, because these claims predated this rule change, the pertinent Regulations in effect at the time apply. Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01, 2017 WL 168819, at *5853 (Jan. 18, 2017).

abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994).

As an initial matter, to the extent that the ALJ discounted Mr. Lawson's and Dr. Jafary's opinions on the basis that they offered an opinion concerning Claimant's disability, the ALJ has the authority to do so, given that medical opinions that a claimant is "disabled" or "unable to work" or as they relate to a claimant's functional capabilities, therefore a "residual functional capacity . . . or the application of vocational factors" are determinations reserved solely to the Commissioner. See 20 C.F.R. §§ 404.1527(d)(1)-(2), 416.927(d)(1)-(2). To that extent, an adjudicator is not bound to "give any special significance to the source of an opinion on issues reserved to the Commissioner." Id. §§ 404.1527(d)(3), 416.927(d)(3).

To the extent Claimant asserts that the ALJ inappropriately "gave more weight to reviewing psychologists than to the plaintiff's treating psychiatrist and psychologist because they had the opportunity to consider the entire record before forming their opinion" despite the fact that these experts did not review any evidence beyond September 26, 2015 (ECF No. 12 at 35), Claimant incorrectly assumes the ALJ failed to recognize this: in fact, the ALJ gave "partial weight" to their opinions, "to the extent they are consistent with the claimant's residual functional capacity. As State agency mental health consultants, _neither_ Dr. Roman _nor_ Dr. Harlow had the opportunity to review and consider the entire medical record before forming their opinion."[12] (Tr. at 168) (emphasis added)

---

[12] The ALJ further observed that in addition to the State agency consultants' opinions did not take into consideration the regulatory changes, she "solely had the opportunity to consider the evidence of record as a whole, including full consideration of the claimant's subject reports." (Tr. at 168)

With respect to Claimant's position that the ALJ failed to align her analysis of Mr. Lawson's and Dr. Jafary's opinions with the Regulations' factors, this District has recognized that an ALJ is not required to recount the details of her analysis of medical opinions. Tucker v. Astrue, 897 F.Supp.2d 448, 468 (S.D.W.Va. Sept. 27, 2012) (Eifert, M.J.) The ALJ is "under no mandate to conduct a factor-by factor analysis." Vest v. Colvin, No. 2:15-CV-05886, 2016 WL 5334668, at *3 (S.D.W.Va. Sept. 22, 2016) (Johnston, J.).

Regarding Mr. Lawson's opinions, the ALJ noted the record contained several[13], and she noted Mr. Lawson's opinion that Claimant "is unable to complete a normal workday or workweek without interruptions from psychologically based symptoms." (Tr. at 168-169, 1241)[14] The ALJ further noted that Mr. Lawson opined that Claimant is unable to maintain attention in two-hour segments (Tr. at 169, 1241), and that Claimant "would not be a candidate for vocational rehabilitation due to the severity of his symptoms, as he has decreased pace and would affect the efficiency of others." (Tr. at 169, 1196)[15] The ALJ then gave Mr. Lawson's opinions "little weight" finding them inconsistent with the mental status examination findings throughout the record. See 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give that medical opinion."). The ALJ then

---

[13] The ALJ cited Mr. Lawson's opinions from June 22, 2015, September 15, 2015, May 20, 2016, December 11, 2017, as well as office treatment notes from July 23, 2014 through May 27, 2016 and January 25, 2018 through September 14, 2018. (Tr. at 839-843, 844-856, 1012-1018, 1019-1048, 1195-1198, 1229-1243) It is noted that with regard to the office treatment notes the ALJ considered, they included the psychological testing results from July 2014, a "to whom it may concern" letter dated October 8, 2015, and the Mental Impairment Questionnaire completed on September 14, 2018.

[14] The ALJ referred to Mr. Lawson's opinion from September 14, 2018.

[15] Here, the ALJ is referring to a letter dated December 11, 2017.

provided examples as to why she found Mr. Lawson's opinions were inconsistent with the record: "the claimant's concentration and attention are generally described as 'good' (*See, e.g.*, Exhibits 22F, p. 1-2; 32F, p. 1, 3, 5, 7, 9; 37F, p. 2-3, 5-9; 43F, p. 3-4).[16] Furthermore, the claimant's activities of daily living do not support the reported severity of his symptoms." (Tr. at 169) It is notable that earlier in the written decision, the ALJ found Claimant had no limitations with regard to concentrating, persisting, or maintaining pace, again citing to his treating providers describing his attention and concentration as good. (Tr. at 162, 959[17], 1055[18], 1063[19], 1132[20], 1222[21]) The ALJ also provided examples for her finding from the record, noting that Claimant can perform a serial three and serial seven test without multiple errors. (Tr. at 162, 767, 1024)[22] Moreover, the ALJ determined Claimant had no limitations in adapting or managing himself, basing this finding on his function reports wherein he indicated he attends to his personal care, watches television, goes out independently, drives, walks, assists with household chores, and manages his finances. (Tr. at 162, 605-613, 631-639)[23] The ALJ also noted that examination notes in the record also indicated Claimant retains the ability to maintain his personal care, prepare simple meals, drive,

---

[16] The ALJ cited Dr. Jafary's office treatment notes dated: June 15, 2016 and August 16, 2016 (Tr. at 1062-1063); September 29, 2016, October 11, 2016, November 10, 2016, December 9, 2016, and January 6, 2017 (Tr. at 1126, 1128, 1130, 1132, 1134); September 5, 2017, December 4, 2017, March 13, 2018, and June 12, 2018, (Tr. at 1218-1219, 1221-1225); and October 9, 2018 (Tr. at 1341-1342).

[17] This concerns Dr. Jafary's office treatment note dated February 17, 2016.

[18] This record concerns Claimant's hospitalization at Beckley Appalachian Regional Hospital and is dated July 27, 2016, and listing Dr. Jafary as the attending physician.

[19] This is another treatment note from Dr. Jafary, dated August 16, 2016.

[20] This is a Dr. Jafary treatment note dated December 9, 2016.

[21] This is another Dr. Jafary treatment note dated December 4, 2017.

[22] The ALJ referred to testing results provided by Ms. Bell from April 5, 2015 and Mr. Lawson from July 23, 2014.

[23] The record indicates these reports are dated November 28, 2014 and July 17, 2015.

attend social gatherings, and spend time with his grandchildren. (Tr. at 162-163, 768[24], 787[25], 849, 854, 1042, 1087)[26]

With regard to Dr. Jafary's opinion, the ALJ noted he is a "treating source" (Tr. at 169, 941, 951[27], 1112), and that he "generally said the claimant should remain unemployed due to deficits caused by his mental impairments." (Tr. at 169, 941)[28] The ALJ further noted that Dr. Jafary opined that Claimant "would be unable to perform occupational duties, as a small change in environmental or situation could exacerbate his condition." (Tr. at 169, 1112)[29] The ALJ then afforded these opinions "little weight", again noting that mental status examinations throughout the record did not support them, and further noting that Dr. Jafary's own "detailed examination notes do not support his opinion, as he routinely documented the claimant's mental impairment to be stable. Finally, portions of Dr. Jafary's opinion are vague and not in functionally relevant terms." (Tr. at 169) Again, the ALJ's evaluation of Dr. Jafary's opinion complies with the Regulations. See 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give that medical opinion."); see also Id. §§ 404.1527(a)(2), 416.927(a)(2) (defining medical opinions as statements reflecting judgments about the nature and severity of an impairment, including symptoms, diagnosis and prognosis, what you can still do despite impairment, and your physical or mental

---

[24] The ALJ again refers to Ms. Bell's findings.
[25] This record is from a treatment note from Hope Clinic dated April 7, 2015.
[26] These last four citations are from Mr. Lawson's treatment notes dated September 15, 2015, March 31, 2015, and October 4, 2016.
[27] This citation concerns a prescription Dr. Jafary wrote for a four-pronged cane on September 22, 2015.
[28] The ALJ references the October 21, 2014 "to whom it may concern letter".
[29] The ALJ refers to another "to whom it may concern letter" dated June 5, 2017.

restrictions). Because Dr. Jafary did not provide such report for his opinion, the ALJ reasonably afforded it less weight. Id. §§ 404.1527(c)(3)-(4), 416.924(c)(3)-(4).

It is clear from the ALJ's discussion of the opinion evidence provided by Claimant's treating psychologist and psychiatrist complied with the pertinent jurisprudence and that she provided "good reasons" for the weight afforded to these treating sources' opinions. Id. §§ 404.1527(c)(2), 416.927(c)(2). Further, to the extent that Claimant has questioned the disparate values assigned to the State agency psychological consultants' opinions and those provided by Claimant's treating sources (ECF No. 12 at 35-36), Claimant ostensibly advocates the proposition that this Court reweigh the conflicting evidence of record and substitute its own opinion in lieu of the Commissioner's, which has long been deemed improper. See Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) ("In reviewing for substantial evidence, we do not undertake to reweigh conflicting evidence, make credibility determination, or substitute our judgment for that of the Secretary." In short, the ALJ has discharged her duty pursuant to Sections 404.1527(c) and 416.927(c) and provided an adequate explanation for her conclusions that allows for meaningful review. See DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983).

Finally, with respect to Claimant's argument that the vocational expert opined Claimant was disabled under the restrictions determined by his treating psychologist in the Questionnaire he completed in September 2018 (ECF No. 12 at 36), again, as noted *supra*, only the ALJ decides disability or RFC assessments, and opinions that pertain to such issues enjoy no special significance. See 20 C.F.R. §§ 404.1527(d)(1)-(2) and (d)(3), 416.927(d)(1)-(2) and (d)(3). Further, as discussed *supra*, the ALJ provided a thorough discussion of the evidence of record concerning Mr. Lawson's opinion, and gave an appropriate explanation for her reasons discounting

it. Given that finding, the ALJ was under no duty to adopt limitations in the RFC simply because they were posed to the vocational expert in a hypothetical question. Rather, it is well-established that an ALJ's hypothetical question to the vocational expert "need only reflect those impairments supported by the record." <u>Russell v. Barnhart</u>, 58 F. App'x 25, 30 (4th Cir. 2003).

Accordingly, the undersigned **FINDS** that the ALJ's evaluation of the opinion evidence provided by Claimant's treating psychologist and psychiatrist complies with the Regulations and with this Circuit's jurisprudence, and is therefore not erroneous. Additionally, the undersigned further **FINDS** that the ALJ's evaluation of the opinion evidence is supported by substantial evidence.

Finally, the undersigned **FINDS** that the decision finding Claimant was not disabled is supported by substantial evidence.

## <u>Recommendations for Disposition</u>

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for remand (ECF No. 13), **GRANT** the Defendant's request to affirm the decision (ECF No. 14), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings

and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Faber, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: April 27, 2020.



Omar J. Aboulhosn
United States Magistrate Judge